**Mary K. LIPIC, Appellant,**

v.

**Joseph G. LIPIC, Respondent.**

**No. ED 80252.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 28, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 2, 2003.

Application for Transfer Denied
May 27, 2003.

Lawrence Gillespie, Clayton, MO, Bruce Hilton, Kirkwood, MO, for appellant.

Charles Todt, Clayton, MO, for respondent.

GLENN A. NORTON, Judge.

Mary Lipic ("wife") appeals the judgment dissolving her marriage to Joseph Lipic ("husband"). Wife specifically challenges the visitation schedule, the enforcement of a post-nuptial agreement and the determination of child support. We reverse in part and affirm in part.

## I. BACKGROUND

Wife filed for dissolution of her marriage to husband. In its decree of dissolution, the trial court gave physical and legal custody of the couple's two children to wife and granted husband visitation for a period of three months subject to "monitoring." The court stated that it was imposing the initial three-month schedule because husband lacked an "understanding of the emotional and developmental needs of the minor children." An outside service provider was ordered to monitor husband and assist him in his parenting skills. This monitoring would automatically end after three months.

During the course of the marriage, husband and wife had signed a post-nuptial agreement apportioning to each party their previously-held separate assets, with the parties' subsequently-acquired marital property to be divided equally. Under the agreement, wife waived her right to maintenance and attorney fees in the event that she filed for a dissolution. In consideration for signing the agreement, husband agreed to pay wife $5,000 at the time of the agreement's execution, $12,000 one year later and a sum of between $10,000 and $30,000 upon dissolution of the marriage, depending upon the length of the marriage. Both husband and wife obtained the advice of counsel before signing the agreement. Two different attorneys recommended that wife not sign it. At the dissolution proceeding, wife alleged that the agreement should not be enforced be-

cause it was void on its face. The trial court disagreed and included the terms of the agreement in the decree of dissolution.

Husband was the beneficiary of an irrevocable trust that his parents had arranged. Husband maintained a job, but the trial court found that he was employed "ridiculously below his mental and earning capacity." In calculating the child support to be paid by husband, the trial court imputed some income to husband based on his capacity to earn at a higher income level, but refused to impute income from the trust.

## II. DISCUSSION

On appeal from a decree of dissolution, we will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Anderson v. Anderson*, 55 S.W.3d 444, 445 (Mo.App. E.D.2001) (citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976)). We accept the evidence and inferences favorable to the trial court's decision and disregard all contrary evidence and inferences. *Chen v. Li*, 986 S.W.2d 927, 931 (Mo.App. E.D.1999).

### A. Monitored Visitation

In Point I, wife contends that the trial court misapplied the law when it allowed husband's monitored visitation to end without a showing that husband eliminated or reduced his lack of understanding of the children's emotional and developmental needs. Wife relies on section 452.400.2 RSMo (2000) [1] for the proposition that husband is first required to show rehabilitation before the monitoring restriction can be removed. Wife's reliance

is misplaced. Subsection 2 of that statute provides:

> The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his emotional development. When a court restricts a parent's visitation rights or when a court orders supervised visitation because of allegations of abuse or domestic violence, a showing of proof of treatment and rehabilitation shall be made to the court before unsupervised visitation may be ordered.

The requirements of this subsection are limited to "instances when the court is modifying an existing order." *Turley v. Turley*, 5 S.W.3d 162, 165 (Mo. banc 1999). The order before us is an original grant of visitation rights, not a modification. Therefore, Section 452.400.2 does not apply.

Section 452.400.1 addresses original orders and gives the court broad powers to establish visitation to protect the children's best interest:

> A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his emotional development.

*See H.S.H. ex rel R.A.H. v. C.M.M.*, 60 S.W.3d 656, 660 (Mo.App. E.D.2001). In *J.L.S. v. D.K.S.*, this Court evaluated the propriety of automatically lifting a restriction on visitation in an original order. 943 S.W.2d 766 (Mo.App.E.D.1997). In *J.L.S.*, the father underwent a male to female sex-reassignment surgery while he and his wife were separated, but before the disso-

---

**1.** All statutory references are to RSMo 2000.

lution of the marriage. *Id.* Upon dissolution, the trial court ordered that there would be no visitation with the father for twelve months. *Id.* at 772. After twelve months, an unrestricted visitation schedule was to commence automatically. *Id.* The mother in *J.L.S.* made an argument similar to wife's argument here: that the trial court erred by including in its original order a provision automatically removing the restriction on the father's visitation without requiring an affirmative showing by the father of rehabilitation. *Id.* at 772. This Court found that at the time of the original visitation decree the "removal of the restriction on father's visitation rights at the end of twelve months was not supported by the evidence." *Id.* at 773. The case was remanded back to the trial court so that "in the best interest of the children, a reevaluation of all parties" could occur before the father was granted visitation. *Id.*

█ Thus, to insure protection of the children's best interest under section 452.400.1, a trial court is required to reevaluate the parties' situation before lifting a restriction placed on visitation when, at the time the restriction is imposed, the court cannot determine what will be in the children's best interest. *See J.L.S.*, 943 S.W.2d at 773.

There may be cases in which, at the time of the original order granting visitation, the court *can* determine what will be in the best interest of the children after a given period of restricted visitation. For example, a trial court could determine that given a parent's long absence from the children, it would be best that the first few visits with that parent take place at the home of a grandparent or other relative, but that thereafter unrestricted visitation would be appropriate. In those cases, the trial court may be in a position to know what is in the best interest of the children

at the end of those initial visits without first requiring the parties to come back before the court for a reevaluation of the situation.

█ That is not the situation here. In this case, the trial court's decision to remove monitoring at the end of three months was not supported by the evidence before it at the time the dissolution decree was entered. The trial court imposed the monitoring in recognition of the "emotional needs of the children and lack of significant contact between [husband] and the minor children, and lack of [husband's] understanding of the emotional and developmental needs of the minor children." To address these concerns the court ordered the monitoring to be done, not by a family member, but by an outside service provider with theoretical expertise in the area of family developmental needs. The record reveals nothing from which the trial court could have determined the type of parent husband would be after three months of monitoring and assistance from the outside provider. Therefore, we must remand the case for a reevaluation of the parties' situation to determine what visitation schedule is in the best interest of the children. *See J.L.S.*, 943 S.W.2d at 773.

Point I is granted.

## B. Post–Nuptial Agreement

In Point II, wife contends that the trial court erred in finding that the post-nuptial agreement was enforceable. Wife urges this Court, based on law from other jurisdictions, to find that post-nuptial agreements are to be treated differently from ante-nuptial agreements and dissolution settlement agreements. According to wife, the fact that one party signs the post-nuptial agreement out of a desire to keep

the marriage intact requires courts to treat them as being inherently different from ante-nuptial agreements—which are signed in contemplation of entering marriage—or dissolution agreements—which are signed when both parties acknowledge that the marriage is over. Essentially, wife would have us hold that post-nuptial agreements in Missouri are against public policy. We decline to do so.

■ No court in Missouri has declared that post-nuptial agreements are against public policy. This Court has addressed whether a trial court properly divided property under a post-nuptial agreement. *Reisenleiter v. Reisenleiter,* 926 S.W.2d 914, 916 (Mo.App. E.D.1996). In *Reisenleiter,* the parties had stipulated in open court that the agreement would control the division of property in the dissolution proceeding, and therefore this Court found that the agreement governed. *See id.* at 918. While *Reisenleiter* did not directly address the public policy of post-nuptial agreements, when a public policy issue is involved, the court may address it even if the parties did not raise it. *See Hackman v. Dandamudi,* 733 S.W.2d 452, 455 (Mo. App. E.D.1986). Had this Court believed that post-nuptial agreements were against public policy in Missouri, it could have said so in *Reisenleiter.* It did not, and neither will we. We do not believe that post-nuptial agreements are against public policy in Missouri.

The law regarding the enforcement of ante-nuptial agreements, which is well-settled, is instructive. Our case law indicates that Missouri public policy does not oppose enforcing agreements regarding the division of property made in contemplation of marriage, and in contemplation of the possible dissolution of the marriage. *See Gould v. Rafaeli,* 822 S.W.2d 494, 496 (Mo.

App. E.D.1991). We can think of no public policy reasons why agreements made in contemplation of continuing a marriage should not be equally enforced. The pressures involved when one party to an ante-nuptial agreement wants to get married are at least similar to the pressures involved when one party wants the marriage to continue. The concern that these pressures will produce unfair results have led our courts to impose standards on the enforceability of ante-nuptial agreements. These standards apply to all ante-nuptial agreements, whether signed in complete harmony, or signed when one party feels a great deal of pressure.

■ Ante-nuptial agreements will not be enforced unless they are entered into "freely, fairly, knowingly, understandingly and in good faith and with full disclosure." *McMullin v. McMullin,* 926 S.W.2d 108, 110 (Mo.App. E.D.1996). These are the very concerns wife raises in this case. If these requirements have been met, then the agreement is binding on the trial court unless the court finds the agreement unconscionable. *See Darr v. Darr,* 950 S.W.2d 867, 871 (Mo.App. E.D.1997). The standards regarding the enforceability of ante-nuptial agreements also adequately address the concerns regarding post-nuptial agreements. Thus, the trial court did not err in applying those standards to this post-nuptial agreement.

■ Under that standard, the trial court found that this post-nuptial agreement was not unconscionable. An ante-nuptial agreement, and therefore a post-nuptial agreement, is unconscionable when "the inequality [is] so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality

of it." *McMullin*, 926 S.W.2d at 110. In *McMullin*, this Court affirmed a trial court's determination that an ante-nuptial agreement was unconscionable when the agreement precluded the wife from receiving marital property, did not fully disclose the husband's assets and did not allow the wife enough time to consult with an attorney. *McMullin*, 926 S.W.2d at 111. In this case, the agreement apportioned the marital assets equally between husband and wife and fully disclosed husband's assets. Further, wife consulted with not one, but two attorneys, both of whom advised her not to sign the agreement. We have found similar agreements signed against the advice of counsel to be conscionable. *See Darr*, 950 S.W.2d at 871.

 This Court has held that one of the main reasons for the unconscionability standard is to protect the unwary and ill-informed spouse. *See Gould*, 822 S.W.2d at 496. There is nothing in the record to indicate that wife was unwary or ill-informed in any way. While wife may now feel that she entered into an imprudent deal, "[t]he mere fact that hindsight may indicate the provisions of the agreement were improvident does not render the agreement unconscionable." *Heady v. Heady*, 766 S.W.2d 489, 491–492 (Mo.App. E.D.1989). The trial court's finding that the agreement was not unconscionable is supported by substantial evidence and is not against the weight of the evidence.

Point II is denied.

## C. Trust Income

 In Point III, wife contends that the trial court erred when it did not include the cash distributions from the trust in its calculation of husband's gross income on the Form 14. Husband is the beneficiary of a non-revocable trust, which is administered by his father as the trustee. The trust consists of shares of partnerships and subchapter S corporations[2] in which husband's father is either the chairman of the board or controls all of the voting stock.

According to wife, the trust simply serves as a receptacle for income from the various entities of husband's father with husband ultimately receiving all of this income from the trust. "Gross income" is defined on Form 14 to include trust income under certain circumstances. Comment B to Form 14 sets out four factors that the court is to consider in determining whether to include trust income in a parent's gross income. Those factors are:

(1) the authority of the parent under the trust to direct payment of monies from the trust, including any authority to invade and control distribution of the trust corpus;

(2) the authority of the parent under the trust to make decisions concerning investment of the assets of the trust;

(3) the realistic expectation that the parent will continue to receive the amount of trust income received during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods; and

(4) the validity of the reasons of the parent in making any adjustment in trust income from that received during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods.

---

**2.** Subchapter S corporations are governed by section 143.471 RSMo (2000).

In calculating child support, the use of Form 14 is mandatory. *Neal v. Neal,* 941 S.W.2d 501, 504 (Mo. banc 1997). Considering all of the relevant factors in the comment to Form 14, the trial court determined that any income from husband's trust could not be included in his gross income. We will not disturb a trial court's award of child support unless the evidence is "palpably insufficient" to support it. *McGowan v. McGowan,* 43 S.W.3d 857, 861 (Mo.App. E.D.2001).

In this case, the trial court heard substantial testimony from the trust's accountant concerning the management of this particular trust. The accountant showed that the authority to direct monies from the trust, as well as the authority to make decisions concerning investment of the trust's assets, lay with husband's father. *See* Form 14, Comment B(1) and (2). The trust was part of a larger financial plan put in place by husband's father designed to lessen his tax liability. Any monies received by husband from the trust were used simply to pay the taxes on the trust. These taxes were paid by the trust in order to lessen the *father's* tax liability—not husband's. The husband was not receiving income from the trust and therefore could not make any adjustments to trust income received. *See* Form 14, Comment B(3) and (4). We cannot say that the evidence was palpably insufficient. The trial court did not err in excluding the trust income from husband's gross income.

Point III is denied.

### III. CONCLUSION

The portion of the judgment setting forth visitation is reversed and remanded to the trial court for reevaluation of the visitation schedule consistent with this

---

3. Husband's motion to dismiss, taken with the

opinion. The judgment in all other respects is affirmed.[3]

WILLIAM H. CRANDALL, P.J. and SHERRI B. SULLIVAN, J., concurring.